A02A1065. LAMAR v. THE STATE.
(568 SE2d 837)

MIKELL, Judge.

A jury convicted William Stokes Lamar of voluntary manslaughter, two counts of aggravated assault, and possession of a firearm during the commission of a crime following the shooting death of his brother. Lamar was acquitted on charges of malice murder and felony murder. He appeals the voluntary manslaughter conviction, arguing that the court erred in denying his motion for a directed verdict and in admitting a photograph of the victim without a proper foundation. We affirm the conviction.

On appeal from a criminal conviction, the evidence is viewed in the light most favorable to the verdict. *Paul v. State*, 231 Ga. App. 528 (499 SE2d 914) (1998). We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a

---

[21] *Coney v. State*, 209 Ga. App. 9, 11 (1) (432 SE2d 812) (1993).

reasonable doubt. *Williams v. State*, 233 Ga. App. 217 (1) (504 SE2d 53) (1998).

So viewed, the evidence shows that on the night of October 30, 2000, Lamar, who worked as a truck driver, parked his rig at his mother's home at approximately 7:30 or 8:00. Next, Lamar drove his car, a Ford Granada, from his mother's home to his sister's, where he lived at the time in question. He returned to his mother's home shortly thereafter, driving a gray Ford pickup truck. While Lamar was parking his pickup truck, he drove into a muddy area where his mother's washing machine drained. As he turned the truck around, the tires "slung mud," some of which landed on a white truck belonging to one of Lamar's sisters. His brother Tommy was driving the truck that day.

Lamar entered the house and retrieved the keys to one of several vehicles located in the yard of his mother's residence. Lamar parked his truck so that the headlights illuminated a red 1987 Ford Thunderbird parked in the yard, and he began changing the red car's tires. He left the engine of his pickup truck running and the driver's side door open. There were at least three other vehicles in the yard: an old truck belonging to Lamar's father, "a tan colored car with the trunk up on it" that also belonged to Lamar's father, and a black car that had been abandoned.

While Lamar was changing the tires on the Thunderbird, his brother Tommy realized that Lamar's truck had thrown mud inside the white truck that he intended to drive. Tommy, who was unarmed, approached Lamar to ask about the mud. Kyshina Lamar, a niece of the defendant and Tommy, testified that Lamar told Tommy: "Well, I'm sorry about the dirt. . . . What — what's the problem? . . . Just get the hell from around here bothering me. I'll kill all y'all." As Tommy walked toward the house, he said, "[o]h, [S]hot, you ain't going to do nothing." Kyshina testified that "Shot" was Lamar's nickname.

Four witnesses — Kyshina, Tommy's son Dalfron Battle, Lamar and Tommy's nephew Jamus Lamar, and his girlfriend Garnish Bryant — testified that when Tommy walked away, Lamar immediately went to his pickup truck, retrieved a gun, and fired at his brother. After Tommy was shot for the first time, he began to run. He initially continued his original path next to his father's old truck toward the tan car, but then he cut to the right around the house. He was shot a second time in his right armpit. Jamus estimated that Lamar fired approximately ten shots. Tommy collapsed near the driveway of his mother's home. Lamar and Tommy's sister, Charlene Stanton, turned Tommy over from where he collapsed facedown and held him as he died. Investigator Mike Wolfe of the Hancock County Sheriff's Department reported to the scene and observed Tommy's dead body

near the driveway. He identified the autopsy photograph as the person he saw there.

There was also evidence that Lamar shot at Jamus as he was running toward the house. Lamar fled the scene and was observed by Stanton "walking fast" along the side of the road away from their mother's home. Jamus and Battle retrieved two shotguns from the house. Battle shot out the passenger side window in Lamar's parked pickup truck and broke the back window with a rock. Jamus testified that he did not fire his shotgun.

Andrew Lawrence Falzon, an associate medical examiner with the Georgia Bureau of Investigation, testified that two gunshot wounds to the chest were the cause of Tommy Lamar's death. Falzon explained that the first wound was on the left side of Tommy's chest, and the other was in the "posterior fold of the armpit on the right side." Both bullets were recovered and were estimated to be of .22 to .25 caliber.

Investigator Jeff Penna of the Hancock County Sheriff's Department testified that Lamar voluntarily gave a statement. According to Investigator Penna, Lamar admitted that he fired a .22 caliber semi-automatic rifle. Lamar told Penna that he hid the rifle in the woods near his home, but the weapon was never recovered. When Lamar accompanied law enforcement officers to the location where he claimed he hid the rifle, it was not there.

Lamar took the stand in his defense. He testified that as Tommy walked away from him, Jamus began firing at Lamar, and that he retrieved his .22 caliber rifle from his truck and fired back. Contrary to the testimony of the other witnesses, Lamar testified that he never threatened anyone. He admitted leaving the scene and explained that he held his rifle down by his side when he walked on the road in an effort not to draw attention to himself.

1. First, Lamar contends the trial court erred in denying his motion for a directed verdict of acquittal on the voluntary manslaughter charge. According to Lamar, the circumstantial evidence adduced at trial did not exclude every reasonable hypothesis except his guilt. See *Brooks v. State*, 206 Ga. App. 485, 486-487 (1) (425 SE2d 911) (1992). Specifically, he argues that the state failed to prove that the bullets retrieved from Tommy's body were discharged from the rifle fired by Lamar, and he contends that Jamus could have shot Tommy. We disagree.

"The standard of review for the denial of a motion for directed verdict of acquittal is the same as that for reviewing the sufficiency of the evidence to support a conviction." *White v. State*, 250 Ga. App. 783 (552 SE2d 927) (2001). Bearing that standard in mind, we conclude that there was ample evidence in the case sub judice for a

rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia,* supra.

OCGA § 16-5-2 (a) provides, in pertinent part:

> A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person.

As discussed above, four witnesses testified that Lamar became angry when Tommy approached him, that he threatened Tommy, and that he shot him. The medical examiner testified that two gunshot wounds caused Tommy's death, and that the bullets recovered from the body were of .22 to .25 caliber. Lamar admitted firing his .22 caliber semi-automatic rifle while Tommy was in the vicinity. Lamar's rifle was not recovered after he admittedly disposed of it in the woods near his residence.

"A directed verdict of acquittal should be granted only when there is no conflict in the evidence and the evidence with all reasonable deductions and inferences demands a verdict of acquittal as a matter of law." *Gunter v. State,* 237 Ga. App. 863 (517 SE2d 105) (1999). Here, in addition to the witness testimony that Lamar opened fire on Tommy, and contrary to Lamar's allegation that Jamus shot at him, Jamus testified that he did not fire a weapon. Therefore, a directed verdict was not warranted.

> Conflicts in the testimony of the witnesses . . . are a matter of credibility for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld. Here, the jury was authorized to resolve any conflicts in the evidence and find that [Lamar] is guilty beyond a reasonable doubt of [voluntary manslaughter].

(Punctuation and footnotes omitted.) *Hamilton v. State,* 250 Ga. App. 568, 569 (552 SE2d 511) (2001). See also *Jaber v. State,* 243 Ga. App. 562, 563 (533 SE2d 767) (2000). Accordingly, the trial court properly denied Lamar's motion for directed verdict.

2. Next, Lamar contends that the trial court abused its discretion by admitting a photograph of Tommy despite the fact that the authenticating witness, Investigator Wolfe, had never met the victim. The court admitted state's Exhibit 14, which depicted the victim's body, after Investigator Wolfe testified that the person in the

photograph was the same as the one found dead near Lamar's mother's home. Lamar argues that Investigator Wolfe was not qualified as an expert witness with "special knowledge in making scientific identification of corpses," nor was he in a position to offer a lay opinion as to the victim's identity.

It is well settled that "[t]he quantum of evidence required to sufficiently identify photographs as true and accurate representations of what they purport to depict is a matter to be left within the discretion of the trial court." (Citations and punctuation omitted.) *Williams v. State*, 174 Ga. App. 56, 57 (2) (329 SE2d 226) (1985). Investigator Wolfe did not identify the victim as Tommy Lamar based on the photograph; rather, he testified that the photograph depicted the person he found lying near the driveway of Lamar's mother's home. We find no abuse of discretion in the admission of the photograph.

Furthermore, even if the court had erred in admitting the photograph based on Investigator Wolfe's testimony, it would have been harmless error. See *Taylor v. State*, 253 Ga. App. 468, 469 (559 SE2d 499) (2002). Dr. Falzon, who was qualified as an expert forensic pathologist and who performed the autopsy on the victim, testified that the photograph at issue depicted Tommy's body and that it was taken under the doctor's direct supervision. Additionally, Battle, Stanton, and Bryant identified Tommy as the man who collapsed near the driveway after being shot. Lamar did not raise an issue regarding misidentification of the victim.

*Judgment affirmed. Andrews, P. J., and Phipps, J., concur.*

DECIDED JULY 16, 2002.

*Clifton Boone*, for appellant.

*Fredric D. Bright, District Attorney, Wilson B. Mitcham, Jr., Assistant District Attorney*, for appellee.